# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:10cr62

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM AND** |
| **Vs.** | ) | **RECOMMENDATION** |
| | ) | |
| **PAUL JEREMIAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Defendant's "Motion to Suppress"

(#16).   The Government filed a "Response to Defendant's Motion to Suppress and

Request for Evidentiary Hearing" (#18).  The undersigned conducted a hearing and

heard evidence from the Government and Defendant on March 16, 17, 18, and 21.

Having carefully considered Defendant's "Motion to Suppress," the Response, and the

record, including the testimony offered during the hearing, the Court enters the

following findings, conclusions, and recommendations.

## FINDINGS AND CONCLUSIONS

### I.    Procedural Background

Defendant is charged in a one-count Bill of Indictment that on or about April

15, 2010, Defendant possessed one or more visual depictions the production of which

involved the use of a minor engaging in sexually explicit conduct as defined by 18, United States Code, Section 2256(2), in violation of 18, United States Code, Section 2252(a)(4)(B). Defendant filed his "Motion to Suppress" (#16) on February 15, 2011. The Government filed its Response (#18) on February 25, 2011, and the Court set the matter for a hearing on March 16, 2011.

## II.    Factual Background

### A.    Anthony Johnson.

At the hearing, the United States called as a witness Det. Anthony Johnson, a detective with the Police Department of the City of Asheville, North Carolina. Johnson is a criminal investigator focusing on computer crimes and crimes involving exploitation of children. In the summer of 2009 Johnson received two telephone calls from Asheville attorney Joy McIver asking questions about child pornography. McIver did not give Johnson any specific information and did not mention the name of any person. In late August 2009, Johnson received a telephone call from Asheville attorney Robert Deutsch. Deutsch asked Johnson to come to Deutsch's office and meet with Deutsch and Pamela Myers concerning a person who could possibly have possession of child pornography.

On August 26, 2009, Johnson went to Deutsch's office and met with Deutsch and Myers. Johnson brought to the meeting a laptop computer, which Johnson usually

used for mobile forensics.  At the meeting Myers told Johnson she had found computer disks in her residence which contained child pornography.  Myers further stated that she and her husband, Defendant Paul Jeremias, had separated from each other in May of 2009.  Myers explained that upon advise of an attorney she began copying computer disks that Defendant had left at the residence;  Myers was looking for financial records  of her husband for use in a potential divorce proceeding.  On June 2, 2009, while looking through these computer disks, Myers found images that she believed to be child pornography.  After finding the images, Myers took and hid some of the disks.  She then copied other computer disks onto the hard drive of her computer.  Myers later copied the data from her hard drive to additional computer disks, in order to make copies of the original computer disks.

During this meeting Myers handed several computer disks to Johnson who placed them into his laptop computer.  The resulting images that Johnson saw were, in his opinion, images of child pornography.  Myers then told Johnson she had more computer disks containing child pornography, which she had buried in the earth near the front porch of her house.  She requested that Johnson come to her home and take possession of the buried computer disks.

After concluding the meeting at Deutsch's office, Johnson traveled to the residence of Myers and Defendant located at 76 Gertrude Place in Asheville, North

Carolina.  Myers escorted Johnson to a mulch bed located near the front porch of the dwelling house.  Myers then used a shovel to dig up a package of additional computer disks she had previously buried.  Johnson then took possession of the computer disks. Johnson did not go into the residence on August 26, 2009.

Myers then told Johnson that she feared more contraband was in the house.  She invited Johnson to conduct a search of the residence.  On September 1, 2009, Johnson returned to the residence with Det. Ricardo Martinez and Deputy Jeff Sluder of the Buncombe County Sheriff's Office and Lee Ridley, an officer with the town of Black Mountain Police Department.  None of the officers obtained a search warrant to search the home.

Myers met the officers at the door of the home, invited them inside, and provided the officers with a tour of the home's three levels.  Johnson concentrated his area of search to an upstairs room which he called a "office and library".  Myers told Johnson this was a common area used by both her and Defendant to conduct their various professions.  The room was approximately 15 feet by 30 feet in size with a ten foot high ceiling.  Johnson saw a table, which was being used as a desk.  He also saw a credenza. Both of these items were in a corner of the room.  On the credenza was a fax machine and other business equipment.  On the desk were writing instruments and papers.  A photograph was introduced into evidence as Government's Exhibit G-5

illustrating Johnson's testimony. Also in the room was an open closet or cupboard containing papers, office supplies, photographic materials, and other items of personal property. A photograph was introduced into evidence by the government as Exhibit G-6 illustrating Johnson's testimony concerning the closet or cupboard. While searching the closet, Johnson found a computer device known as a "hard drive" and another computer device known as a "super disk." Myers told Johnson the hard drive and super disk did not belong to her, and that she had never seen them before. Johnson took the hard drive and the super disk into his custody. Johnson was of the impression that the hard drive and the super disk were items abandoned in the house by defendant.

Johnson then took all of the computer disks, the hard drive, and the super disk to the Asheville Police Department headquarters, where he cataloged the items and stored them until he could do a computer analysis of the items. After several months, Johnson completed his examination and testified that he found 7,048 images of child pornography on the computer disks and 2,035 images of child pornography on the hard drive. (Government's Exhibit 8.) He also found movies of child pornography on the computer disks. He could not access the super disk.

On April 15, 2010, Johnson and Sluder went to the residence of Defendant at Rosebud Lane in Fairview, North Carolina, which is located south of the City of

Asheville. The purpose of the visit was to conduct a "knock and talk" with Defendant. Johnson and Sluder arrived at the residence at 9:00 a.m. Defendant invited the officers into his home where a discussion ensued. Johnson told Defendant he and Sluder were investigating internet crimes against children, and that Myers had given computer media to the officers containing images of child pornography. Johnson did not tell Defendant about each separate item - the computer disks, hard drive, and super disk. Defendant told the officers he was responsible for the images of child pornography on the computer media. Johnson asked Defendant if he had possession of other items containing child pornography. Defendant replied that he was not sure if he continued to possess child pornography but that he would look and contact Johnson if he found any. Johnson asked Defendant if he would make a formal written statement about his possession of child pornography, to which Defendant responded that he would think about doing so. Johnson and Sluder then left the residence.

At 4:30 p.m. on the same day, Defendant called Johnson and told Johnson he would meet Johnson at the Asheville Police Department headquarters. In a private interview area, Defendant delivered to Johnson two additional computer disks. Johnson brought to this meeting the computer disks delivered to him by Myers at his initial meeting with her and the hard drive, which Johnson had seized on September 1, 2009. Defendant told Johnson that these items belonged to him. Johnson looked

at the two computer disks brought to the meeting by Defendant and saw that they had been physically damaged. The interview with Defendant lasted about thirty minutes. The Defendant did not provide a written statement and at no time did Johnson advise Defendant of his rights according to <u>Miranda vs Arizona</u>, 384 U.S. 436 (1966). The Defendant was not arrested and was allowed to leave.

After this meeting with Defendant, Johnson examined one of the two computer disks delivered to him by Defendant. He found 1,483 images of child pornography on the first disk. The second disk was damaged to the degree that it could not be examined.

Johnson made handwritten notes of his conversations with defendant. On April 17, 2010, Johnson used those handwritten notes to prepare a supplemental report (Defendant's Exhibit 56). The report reads as follows:

> On Wednesday, August 26, 2009, @1100am, Det. A.J. Johnson of the Asheville Police Department met with Robert Deutsch and Pam Myers at 73 North Market Street in downtown Asheville. Det. Johnson had been previously contacted by Deutsch, who was acting as legal council to Myers.
>
> Myers was in the process of going through a divorce with her husband of many years, Paul Jeremias. Jeremias was a photographer and an artist; his finances were not easily located and tracked. Acting on legal council, Myers began to look through various CD's and DVD's found in her home that she shared with Jeremias, searching for financial and business records to aid in her divorce. Myers, who had been instructed to copy the CD's and DVD's, found that several of the disks contained pornography. Upon closer inspection, Myers found what appeared to be

images depicting child exploitation.

Myers contacted her divorce attorney, who in turn, counseled her to interact with law enforcement with the aid of Deutsch.

Myers spoke with the detective at length about the details concerning her discovery of the disks. She brought copies of some printouts of the file structure of some of the disks, as well as biographical information concerning the suspect. Myers also brought several of the disks she had recovered from her home. Some of the disks in question were originals, some were copies made by Myers.

Det. Johnson viewed one of the disks provided by Myers and found it to contain numerous images depicting child exploitation.

Myers gave a biographical account of her relationship with Jeremias. Myers agreed to write a statement concerning this and other germane information.

Myers agreed to allow Det. Johnson and other investigators to perform a consensual search of her home at 76 Gertrude Place.

After preparing the report, Johnson destroyed his handwritten notes.

### B.  Pamela Myers.

Pamela Myers was called as a witness by the government.  Myers and Defendant were married to each other in 1993 and moved to Asheville in 1995.  They were divorced from each other in 2010.  Myers and Defendant jointly own the residence located at 76 Gertrude Place in Asheville, North Carolina.  Myers is director of the Asheville Art Museum.  The Defendant is a commercial and fine art photographer and also works on electronics and audio equipment.  Myers assisted

Defendant in his business by, among other things, entertaining his clients, helping him with his equipment, placing telephone calls, and taking messages. Located in the dwelling house was a room that Myers and defendant both used for their work purposes, which they each referred to as either an office or a library. Both Myers and Defendant used the room which contained a desk, credenza, fax machine, and a bookcase or cupboard. The bookcase or cupboard was used to store their business supplies, business records, household files, and miscellaneous items used by both Myers and Defendant. Photographs of the room and cupboard were introduced into evidence by the Government as Government's Exhibits 5, 6, 25, 27 and 33.

In 2008, Myers and Defendant experienced marital disagreements. In February 2009, Defendant told Myers he wanted a divorce. Defendant rented a dwelling place in the Fairview Community of Buncombe County and began moving items of personal property from the home at 76 Gertrude Place to his Fairview residence. By March 2009, Defendant was sleeping some nights at the Gertrude Place Residence and some nights in Fairview.

During April and May 2009, Defendant was moving items of personal property from the 76 Gertrude Place residence to his residence in Fairview. He and Myers had agreed to use a "collaborative law" procedure in an attempt to settle and compromise their separation. (Government's Exhibit 20.) This procedure is provided for under

N.C.G.S. § 50-7.  On May 27, 2009, Defendant sent an email to Myers in which he expressed his disapproval regarding the moving of certain items of personal property by Myers. (Government's Exhibit 22.) The document states:

> Hi Pam,
>
> I came home this evening after the movie to find that my computer had been unceremoniously removed from my desk and placed in your office. You also seemed to have gone through my papers on my desk and found a cd.
>
> Since we discussed not only computer use in the house and both agreed that we would not take dramatic or extreme actions during this process which might threaten the other or the process, I am concerned that you have once again mistaken my normal activities for something malicious.
>
> Please do not touch, remove or replace anything of mine now or at any time during our negotiations.  I will be happy to discuss any question, concern or apprehension of yours–as they pertain to computers, cds, or whatever–with any or all of our lawyers, and/or Barbara Lea at any time.
>
> I will be on my cell phone tomorrow and I will come home to shower, change clothes and start some packing the garage, basement and in the small guest room.

On May 29, 2009, Myers and Defendant entered into a written agreement, which provides that: "[a]t Paul's request Pam promised that she wouldn't touch anything that Paul labels as his personal property.  Paul agreed to stay out of Pam's  personal belongings.  Marital papers will remain open to both."  Defendant did not label any items of personal property.  Defendant did not stay in the dwelling house at 76

Gertrude Place after May 29, 2009, although he returned from time to time during the month of June and at other times in 2009 to remove items of personal property.

Beginning in February 2009, Myers started the process of copying computer disks which were located on the desk and in the cupboard in the office and library. She testified she was trying to copy business records of the Defendant for her potential use during divorce proceedings. Myers would take disks from the desk in the library or from the cupboard and would then copy them to her computer's hard drive. She would then place the copied disks back on the desk or back in the cupboard in the library. Defendant's Exhibit 39 shows the desk with various computer disks that were located in the library. On June 2, 2009, while searching through some of the computer disks, she found a number of disks containing images of what, in her opinion, were child pornography. She took possession of some of the computer disks (Government's Exhibit G-2), and others she copied onto the hard drive of her computer. She placed the original disks (Government's Exhibit 2) in a file box underneath a bed in a guest bedroom at the 76 Gertrude Place residence. After copying other disks, she returned those disks to the desk or cupboard in the library. (Government's Exhibit 27.) On July 19, 2009, she copied the information and images that she had placed upon her computer hard drive onto a group of new computer disks. (Government's Exhibit 1.) She then placed the original computer disks

(Government's Exhibit 2) and the copied disks (Government's Exhibit 1) into plastic bags and buried them in a flower bed adjacent to the dwelling house at 76 Gertrude Place.

On August 26, 2009, Myers met with Johnson in the office of Deutsch and delivered to Johnson a number of the computer disks along with twenty pages of bookmarked web sites of Defendant. At the meeting, Myers told Johnson how she had obtained the computer disks and what she had found on the disks. She further told Johnson that she and Defendant were in domestic litigation and had been separated since May 29, 2009. She asked Johnson to come to the residence at 76 Gertrude Place where she had other computer disks buried in the earth. Later that day, Johnson came to the house and Myers dug up the remainder of the computer disks and gave them to Johnson. She then told Johnson she was concerned there was more child pornography in the dwelling house and she asked Johnson if he would search the house. Johnson agreed but did not search the house that day.

On September 1, 2009, Johnson returned to the house with other officers. Myers invited the officers into her home and showed the officers through the house from the basement to the top floor of the dwelling. She told Johnson the office or library was shared by her and Defendant during their marriage. There were no locks on the doors to the office or library and nothing had been labeled as "private".

Johnson found some old "super disks" and a hard drive for a computer in the closet cupboard. Myers told Johnson that neither the hard drive nor the super disks belonged to her. When Johnson left he took with him the hard drive and the super disks.

Myers provided a written statement to Johnson which was introduced into evidence as Defendant's Exhibit 4. This statement was provided sometime around August 29, 2009, or early September 2009. The statement reads as follows:

> I have been in marital counseling, mediation, and collaboratie law with my spouse for more than a year. These multiple avenues of support failed. Despite my best efforts, my feeling was that that divorce was inevitable. In April he arranged for a house rental for himself, stayed there some nights and began moving property. In May 2009 the collaborative law process ceased and he premptively filed a complaint for divorce. He has not stayed in the house since May 29, 2009 and an alarm has been installed for my safety.

> The issue of pornography came up in our marriage in 1999, and my husband signed and agreement at that time that he would no longer use it. Recently I was concerned about the amount of time and the secretive nature of his computer use and raised concerns about pornography in a four way legal meeting and in counseling in spring of 2009.

> My husband is a professional photographer-commercial, product and personal-and has been traveling allot-several weeks each in January, February, April, May June and July. He also maintains an audio electronics business and works on contract for Blue Ridge Bio Diesel (I am not sure if he is still doing that).

> Knowing that the likelihood of divorce was probable, on advise of counsel, while my husband was away or out of the house, I attempted to inventory the house and property. I photographed and inventoried

household goods, art, books, financial records, negatives, etc.

Though my husband works on a laptop which he keeps password protected (and I can't access) and that he carries with him at all times, I attempted to copy all disks that I found and as many paper documents as possible. (There is no shared household computer).

I found disks primarily in the closet where we both store slides, office supplies and files, in the credenza in the office where there are also shared supplies and on the top of the desk in the office.

In the course of copying some 100 disks, of what I assumed would be business archival documents, contracts, expense listings and files of commercial or art photography and digital images for clients I found the material I have, after much angst, and good advise, passed on to you.

Though I have been through the house there is no way to know if I have found everything. I have given you the copies I made and the few original disks I kept before my spouse left the house. Since February, he has taken several loads of marital and personal property, disks, cameras, storage devices and the computer from the house.

## C.    Elizabeth Goodman

Elizabeth Goodman was called as a witness by the Government. Ms. Goodman has known the Defendant and Myers for approximately 16 years. Goodman has visited the home at 76 Gertrude Place on many occasions. She has been in the "office" which she calls a "sunroom" several times. She has found that the door to the room is always open and never locked.

## D.    Susan Rhue

Susan Rhue was called as a witness by the Government. She has known

defendant and Myers since 1995.  She has visited many times in the house at 76 Gertrude Place and has been in the office on several occasions.  Myers keeps a copy of Rhue's will in the cupboard in that room.

## III.    Discussion

### A.    Standard Applicable to a Motion to Suppress

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

In regard to the case presented here for review, the undersigned has reviewed opinions of the United States Supreme Court regarding a search and seizure effected by a private person and a search conducted by a law enforcement officer where consent is given by a person other than the victim of the search.  Concerning searches by private persons, the Supreme Court in <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1980) stated:

> The first clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...."  This text protects two types of expectations, one involving "searches," the other "seizures."  A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.  This Court has also

consistently construed this protection as proscribing only governmental action; it is wholly inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." Walter vs United States, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980).

Concerning consent to search given by a person other than the victim, the Supreme Court in United States v. Matlock, 415 U.S. 164, 171 (1974) stated:

When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over and other sufficient relationship to the premises or effects sought to be inspected.

## B.    The Private Search and Delivery of the Computer Disks

In his Motion to Suppress, Defendant appears to contend Myers lacked authority to consent to a law enforcement search of the computer disks she delivered to Johnson. The computer disks (Government's Exhibits 1 & 2) and their delivery to Johnson, however, was not made pursuant to a search by law enforcement. Those items were delivered pursuant to a private search by Myers. The standard for admissibility for items found in a private search was set forth in United States v. Richardson, 607 F.3d 357, 364 (4th Cir. 2010).

The Fourth Amendment guarantees citizens the right to be free from "unreasonable searches and seizures." U.S. Const. Amend. IV. But for a few exceptions, warrantless searches and seizures are "*per se* unreasonable." Scheneckloth vs Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotation marks omitted).

The Fourth Amendment, however, does not protect against searches, no matter how unreasonable, conducted "by private individuals acting in a private capacity."  United States vs Jarrett, 338 F.3d 339, 344 (4th Cir. 2003); *see* United States vs Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).  Rather, the Fourth Amendment "proscrib[es] only governmental action," Jacobsen, 466 U.S. at 113, 104 S.Ct. 1652, and thus "evidence secured by private searches, even if illegal, need not be excluded from a criminal trial," United States vs Ellyson, 326 F.3d 522, 527 (4th Cir. 2003) (internal quotation marks omitted).

However, when a private individual conducts a search "as an instrument or agent of the Government," Skinner vs Railway Labor Executives' Ass'n., 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the limits imposed by the Fourth Amendment apply, *see* Jarrett, 338 F.3d at 344 ("The Fourth Amendment protects against unreasonable searches and seizures by Government officials and those private individuals acting as instruments or agents of the Government."  (alterations and internal quotation marks omitted)).  The defendant shoulders the burden of establishing the existence of an agency relationship–"a fact-intensive inquiry that is guided by common law agency principles." Ellyson, 326 F.3d at 527; *see* Jarrett, 338 F.3d at 344.

There must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional.  Passive acceptance by the Government is not enough." Jarrett, 338 F.3d at 346.  Additionally, we generally look for evidence bearing upon the question of "whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further his own ends." Ellyson, 326 F.3d at 527 (internal quotation marks omitted).

Thus, the key factors bearing upon the question of whether a search by a private person constitutes a Government search are: "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." Jarrett, 338 F.3d at 344.

Defendant has not established the existence of any agency relationship between

Myers and the government. Myers began her examination of the computer disks at the directions of her attorneys, not Johnson. Johnson had no knowledge that Myers existed nor did he have any knowledge of her activities until her delivery of the computer disks to him on August 26, 2009. Myers testified that her purpose in examining the computer disks was to search them for business records so that she could obtain documents potentially needed for a civil proceeding regarding the separation of herself and defendant. The court is of the opinion Myers was also looking for evidence of Defendant's infidelity, but in any event, her purpose was private and personal and was not to aid the government in a criminal investigation. Indeed, Myers held the original computer disks and the computer disks she copied for several weeks subjecting herself to potential criminal liability for possession of child pornography. She only reluctantly disclosed the computer disks and their content to law enforcement. As a result, the undersigned finds that defendant has not met his burden of establishing an existence of an agency relationship between Myers and the Government. Moreover, the record is devoid of any evidence demonstrating Government participation in or affirmative encouragement of the private search. There has been no evidence introduced that the Government knew of or acquiesced in the private search or that Myers original intent was to assist law enforcement. As a result, the undersigned will recommend that the Motion to Suppress the computer

disks (Government's Exhibits 1 & 2) be denied.

Although not addressed by the parties, the undersigned, to assist the District Court, will address the issue of whether Johnson exceeded the scope of the private search when he made a detailed examination of the computer disks (Government's Exhibits 1 & 2) delivered to him by Myers. Sometime after receiving the computer disks, Johnson made a detailed examination of them in which he analyzed and counted the images of child pornography that he found. He did the examination without obtaining a search warrant.

In United States v. Runyan, 275 F.3d 449 (5th Cir. 2001), the United States Court of Appeals for the Fifth Circuit addressed a similar situation. The defendant's wife left the marital home and moved in to live with a boyfriend. Runyan, 275 F.3d at 453. Defendant thereafter locked and chained the entrance to the driveway to his home. Id. at 453. Defendant changed the locks on his house and barn. Id. Defendant's wife, along with friends assisting her, went to the home, climbed over the gate, and broke into the home and into the barn. Id. They then discovered pornography in the barn. Id.

The next day the wife and six of her friends entered into the home with bolt cutters. Id. For two days they removed items of personal property belonging to both the wife and the defendant. Id. Among the items obtained was a desktop computer

and several computer floppy disks and computer media.  Id. The wife had the computer reassembled and began reviewing the computer disks, where she discovered images of child pornography.  Id. The wife then contacted law enforcement, and she delivered the computer disks to law enforcement officers.  Id.

Defendant was then charged with possession of child pornography.  Id. at 455. Defendant moved to suppress this evidence based upon the contention that the government's search of the computer disks exceeded the scope of the private search by his wife.  Id. The Fifth Circuit pointed out that the Fourth Circuit Court Appeals in United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992), had taken the position that police exceed the scope of a prior private search when they examine objects or containers the private searchers did not examine.  The Fifth Circuit Court of Appeals further cited Jacobsen and found that:

> police exceed the scope of a private prior search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, the replication of the private search, and their expertise.

Runyan, 275 F.3d at 463.  The court further held that police do not exceed the private search when they examine the materials found by the private searchers more thoroughly than did the private searchers.  Id. at 464.

Myers testified that she examined all of the computer disks, both the originals

and the copies, in her search for business records. The child pornography was contained within the business records she found on the disks. Thus, the more detailed examination of the computer disks (Government's Exhibits 1 & 2) by Johnson did not exceed the scope of the private search made by Myers.

Finding no reason to suppress the more detailed examination made by Johnson of the computer disks (Government's Exhibits 1 & 2), the undersigned will recommend that the motion for suppression be denied as to the contents of the computer disks (Government's Exhibits 1 & 2).

C.    The Consent Search and the "Hard Drive"

Defendant contends Myers did not have authority to consent to a search of his home or the items seized and taken from the home by Johnson as a result of the search of the dwelling house that occurred on September 1, 2009. Defendant contends he "instructed his wife with regard to electronic data storage devices in his office that she was not to touch, remove or replace anything of mine now or at any time during our negotiations" and, therfore, she did not have authority to consent to a search of the dwelling house or of any items seized therefrom.

At the time of her delivery of the buried computer disks to Johnson on August 26, 2009, at 76 Gertrude Place, Myers asked Johnson to search the dwelling house for child pornography. Johnson returned on September 1, 2009, to the residence with

additional officers. Johnson and his fellow officers were invited into the home by

Myers and after she showed them the interior areas of the dwelling house, the officers

then began their search. Johnson searched in the area known as the "office" or

"library." Johnson found in the cupboard or bookcase a hard drive and a super disk.

Myers told Johnson the hard drive and the super disk did not belong to her. Johnson

seized the hard drive and the super disk.

In Georgia v. Randolph, 547 U.S. 103, 109 (2006), the Supreme Court set forth

the law regarding searches made as a result of consent given by a third party:

> To the Fourth Amendment rule ordinarily prohibiting the warrantless
> entry of a person's house as unreasonable *per se*, Payton v. New York,
> 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); Coolidge v.
> New Hampshire, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564
> (1971), one "jealously and carefully drawn" exception, Jones v. United
> States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958),
> recognizes the validity of searches with the voluntary consent of an
> individual possessing authority, Rodriguez, 497 U.S., at 181, 110 S.Ct.
> 2793. That person might be the householder against whom evidence is
> sought, Schneckloth v. Bustamonte, 412 U.s. 218, 222, 93 S.Ct. 2041, 36
> L.Ed.2d 854 (1973), or a fellow occupant who shares common authority
> over property, when the suspect is absent, Matlock, *supra*, at 170, 94
> S.Ct. 988, and the exception for consent extends even to entries and
> searches with the permission of a co-occupant whom the police
> reasonably, but erroneously, believe to possess shared authority as an
> occupant, Rodriguez, *supra*, at 186, 110 S.Ct. 2793.

The definition of authority and the burden of proof required to prove the

validity of a consent search given by a third party was also recently addressed by the

Fourth Circuit in United States v. Buckner, 473 F.3d 551, 553-554 (4th Cir. 2007):

Although the Fourth Amendment generally prohibits warrantless searches, *see* <u>Maryland v. Dyson</u>, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999), valid consent to seize and search items provides an exception to the usual warrant requirement, *see* <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In responding to a defendant's motion to suppress, the Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search. *See* <u>United States v. Block</u>, 590 F.2d 535, 539 (4th Cir. 1978).

Consent to search is valid if it is (1) "knowing and voluntary," <u>Trulock v. Freeh</u>, 275 F.3d 391, 401 (4th Cir. 2001) (*citing* <u>United States v. Mendenhall</u>, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), and (2) given by one with authority to consent, <u>Trulock</u>, 275 F.3d at 402-03 (*citing* <u>Stoner v. California</u>, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)).

A third-party has authority to consent to a search of property when she possesses "common authority over or other sufficient relationship to the ...effects sought to be inspected." <u>United States v. Matlock</u>, 414 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "Common authority" in this context is not merely a question of property interest. Rather, it requires evidence of "mutual use" by one generally having "joint access or control for most purposes." *Id*. At 171, n. 7, 94 S.Ct. 988. Such use makes it "reasonable to recognize that any of the co-[users] has the right to permit the inspection in h[er] own right and that the others have assumed the risk that one of their number might permit the common [effects] to be searched." *Id.*

The Court of Appeals further described the law regarding apparent authority.

As long as "the facts available to the officer at the moment... 'warrant a [person] of reasonable caution in the belief' that the consenting party had authority," apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed. *Id.* (*quoting* <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also* <u>Kinney</u>, 953 F.2d at 866.

Id. at 555.

Here, Myers had actual authority to consent to a search of the dwelling house. She was one of the actual owners of the home.  At the time she gave consent to search Myers was the sole occupant of the home, and during the period of the search she had at least "joint access and control for most purposes."  Myers had received a directive from her husband concerning his property, but she chose to disregard it.  The directive of her husband was one she could ignore if she so desired.

Myers also had apparent authority.  She told Johnson the house was owned by her, it was lived in by her, controlled by her, and that Defendant had left and was no longer using the dwelling house as a residence.  She further told Johnson she and Defendant had jointly used the home, and, particularly, they had jointly used the area called the office.  Johnson was under the impression Defendant had not only left the residence but had abandoned any personal property that was still there by not removing it.  Accordingly, the consent search was undertaken pursuant to actual authority of Myers and with the apparent authority of Myers.

The analysis of the Motion to Suppress does not, however, stop here.  At the time Johnson found the "hard drive" and "super disk" he was told by Myers she did not own those two items.  Johnson seized them and held them for several months.  At no time did he obtain a search warrant to examine the contents of these devices prior

to his search of their contents.  Three cases provide instruction as to the issue of

whether or not Johnson's search of the contents of the hard drive without a search

warrant violated the Fourth Amendment.

In <u>United States v. Block</u>, 590 F.2d 535, 537 (4th Cir. 1978), officers went to

the home of defendant's mother at 4:45 a.m. in the morning with warrants for the

arrest of another person.  The mother gave the officers consent to search the room of

her son who lived in the dwelling house.  <u>Id.</u>  While searching the room, the officers

found a closed footlocker trunk.  <u>Id.</u> Ms. Block told the officers the trunk belonged to

her son. <u>Id.</u>  The trunk was locked.  <u>Id.</u>  The officers forced open the trunk and found

heroin inside.  <u>Id.</u> at 537-38.  The Court explained the law regarding the search of

enclosed spaces after a consent to search is given by a third party of an unclosed area.

> On the other hand, it is equally well settled that third person consent, no
> matter how voluntarily and unambiguously given, cannot validate a
> warrantless search when the circumstances provide no basis for a
> reasonable belief that shared or exclusive authority to permit inspection
> exists in the third person from any source, <u>Stoner v. California</u>, 376 U.S.
> at 489, 84 S.Ct. 889; nor even more certainly, when the circumstances
> manifest to the contrary that the absent target of the search retains an
> expectation of privacy in the place or object notwithstanding some
> appearance or claim of authority by the third person, <u>Reeves v. Warden</u>,
> 346 F.2d 915 (4th Cir. 1965); <u>United States ex rel. Cabey v.
> Mazurkiewicz</u>, 431 F.2d 839 (3d Cir. 1970); nor, still more certainly,
> when the retained expectation of privacy is manifest in the circumstances
> and the third person actually disclaims any right of access, <u>United States
> v. Wilson</u>, 536 F.2d 883 (9th Cir. 1976), p. 540.

This is as it must be for the protection of one of the primary objects of

> people's ordinary expectations of privacy. <u>Katz v. United States</u>, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's "enclosed spaces" mankind's valises, suitcases, footlockers, strong boxes, etc. are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently in public places or in places under the general control of another. Indeed, to the sojourner in our midst all of us at one time or another the suitcase or trunk may well constitute practically the sole repository of such expectations of privacy as are had.

<u>Id.</u> at 541. The Fourth Circuit held the officers should have obtained a search warrant, and their failure to do so violated defendant's Fourth Amendment rights. <u>Id.</u> at 542. The result of the search was held to be inadmissable as evidence. <u>Id.</u>

In <u>Walter v. United States</u>, 447 U.S. 649,651 (1980), twelve large packages were shipped to Leggs Inc. but were delivered to L'Eggs' Product Inc. instead. When employees opened the packages they found boxes of film. <u>Id.</u> at 652. There were suggestive drawings on the side of the boxes and explicit descriptions of the contents on the side of the boxes. <u>Id.</u> FBI agents were called and they picked up the packages. <u>Id.</u> Several months later the agents, without a search warrant or consent, viewed the films with a projector. <u>Id.</u> The petitioner was thereafter indicted on obscenity charges. <u>Id.</u> The Supreme Court held that the agents should have obtained a search warrant and the motions to suppress should have been allowed. Justice Stevens writing for the court stated:

If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy . Even though some circumstances-for example, if the results of the private search are in plain view when materials are turned over to the Government-may justify the Government's re-examination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search. In these cases, the private party had not actually viewed the films. Prior to the Government screening one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained.

Id. at 657.

Another case that is instructive is Trulock v. Freeh, 275 F.3d 391 (4th Cir. 2001). Notra Trulock shared a computer with Linda Conrad, but each of them maintained separate password protective files on the hard drive of the computer. Trulock, 275 F.3d at 398. Trulock and Conrad did not know each other's passwords and could not access each other's private files. Id. Conrad gave consent to search her townhouse were the computer was located. Id. Trulock was present during the search of the townhouse and the search of the computer. Id. Trulock asked the searching law enforcement officers to produce a warrant and the agents responded "Conrad had consented to the search." Id. The agents took the hard drive to the computer away. Id. Trulock then filed a Bivens action against the agents alleging, in part, that the

search of his private computer files was a violation of the Fourth Amendment. Id. at 399. In discussing the search, the Court held that Trulock password protected files were analogous to the locked footlocker in Block. Id. at 403. The court further found Trulock had a reasonable expectation of privacy in the computer files and had alleged a violation of his Fourth Amendment rights. Id.

Here, Myers stated that not only did she not own the hard drive, but that she had never seen it before. None of the contents were described to Johnson as a result of any private search by Myers. The contents of the hard drive were unknown to Myers. Although not protected by a password, the hard drive is the same device whose search in Trulock was found under similar circumstances to violate the Fourth Amendment. The contents of the hard drive can certainly be described as an "enclosed space" as set forth in Block. Due to Myers disclaimer of ownership or knowledge about the contents of the hard drive, she had no authority to permit inspection of the contents. As set forth in Walters, the search of the contents of the hard drive was a significant expansion of the consent given by Myers who disclaimed any knowledge or ownership of the item or its contents. The search by Johnson of the contents of the hard drive is consistent with the searches in Black and Walters, which were found to be in violation of the Fourth Amendment. A computer hard drive is now the valise, suitcase, strongbox or cabinet where a person, in this more electronic world, stores

their private documents and records.     The undersigned will recommend to the District Court that the search of the hard drive, without a warrant, be suppressed as it, in the opinion of the undersigned, violated the Fourth Amendment.

### D.     The Defendant's Statements and Delivery of the Disks

The Defendant contends in his motion that "any inculpatory statement made by Mr. Jeremias in April 2010 or thereafter was a fruit of the unconstitutional search of his home and seizure of his person." He further contends that his delivery of the additional computer disks he gave Johnson on April 15, 2010, were a consequence of this constitutional violation. Defendant cites Taylor v. Alabama, 457 U.S. 687 (1982), as authority for this position. A reading of Taylor shows that it concerns a statement made by a defendant after an illegal arrest. Defendant here was not arrested by the officers. The officers went to talk to Defendant and do a "knock and talk." Defendant invited the officers into his home, where Johnson told Defendant that Myers previously provided him with child pornography, and that he was at Defendant's home because of the computer media given to him by Myers. Johnson neither told Defendant he was there was because of either the computer disks (Government's Exhibits 1 &2), nor did he describe to Defendant what he had seen in his examination of the hard drive. Defendant admitted the child pornography in the "computer media" was his. On the same day, at the invitation of Johnson, Defendant brought to the

Asheville Police Department two computer disks, at least one of which contained images of child pornography. <u>Taylor</u>, therefore, has no application to the facts of this case.

The statements made by Defendant were voluntary and were in response to Johnson's statement that he had seen child pornography on the computer media, which Defendant immediately admitted belonged to him. The computer media included Government's Exhibits 1 & 2, which the undersigned has found is admissible as evidence. The undersigned cannot find any reason to suppress the statements of Defendant or the delivery of the additional computer disks, one of which contained additional child pornography. Finding no merit to the contention of Defendant, the undersigned will recommend that the Motion to Suppress the statements of defendant and the delivery of the additional computer disks on April 15, 2010, be denied.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** in regard to defendant's Motion to Suppress, that the Motion to Suppress Government's Exhibits 1 & 2 be **DENIED.** That defendant's Motion to Suppress the images contained on the computer hard drive be **ALLOWED** and the Motion to Suppress in regard to the statements of defendant made on April 15, 2010 and the computer disks delivered by defendant to Johnson on April 15, 2010 be **DENIED**.

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: April 28, 2011

Dennis L. Howell
United States Magistrate Judge